■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v MANUEL RIVERA, Respondent. [729 NYS2d 481] —Order, Supreme Court, New York County (Herbert Altman, J.), entered September 23, 1999, which granted defendant's motion to suppress physical evidence and identification testimony, reversed, on the law, and the matter remanded for further proceedings.

As the motion court found, once the minivan in which defendant was a passenger ran a red light and narrowly missed colliding with the unmarked police vehicle, the police were justified in stopping the van (see, People v Ingle, 36 NY2d 413). Our point of departure with the court is its determination that the police could not properly chase the defendant-passenger when they observed him, immediately upon the stop, "jump out and run." The court found that "during his pursuit" Officer Dietrich observed defendant grasp his waist area and then saw a gun in his right hand. However, the officer's precise testimony, which the court fully credited, was that "[defendant] was grasping more or less *as soon as he got out of the vehicle* out of his waist area" (emphasis added). It has long been held that a bulge or grasp at the waist is "telltale of a weapon" (*People v De Bour*, 40 NY2d 210, 221; *People v Reyes*, 91 AD2d 935, 937). The Court of Appeals observed in *People v Benjamin* (51 NY2d 267, 271) that it is apparent to an experienced police officer that a handgun is often carried in the waistband, and that "law-abiding persons do not normally step back while reaching to the rear of the waistband, with both hands, to where [ ] a weapon might be carried." It is equally apparent to an experienced police officer that law-abiding persons do not normally grasp at the waist while exiting a car quickly. In this rapidly developing situation, upon observing defendant's grasping motion, the officer had reasonable suspicion of criminal

activity, which justified the chase that followed (*People v De Bour, supra*, at 223). It is not necessary to engage in speculation as to the possibility that defendant was the driver who violated the traffic laws, particularly since the motion court found that defendant was a passenger. It is defendant's own conduct that provided the predicate for the chase within the parameters delineated in *People v Holmes* (81 NY2d 1056). Of course, given that the police were justified in pursuing defendant, their recovery of the weapons also was lawful (*see, People v Leung*, 68 NY2d 734, 736). Concur—Andrias, Ellerin and Rubin, JJ.

Tom, J. P., and Saxe, J., concur in a Memorandum by Tom, J., as follows: On February 3, 1998, at approximately 1:15 A.M., Police Officers Lee Packtor, Richard Dietrich, Thomas Fischer and Julio Moreno were on anti-crime patrol, in an unmarked car in the vicinity of 112th Street and Park Avenue. Packtor, the driver, had stopped for a red light under the overhead Metro-North tracks, facing east. When the light for northbound traffic turned red, Packtor started to move into the intersection when a dark minivan, heading north on Park Avenue, ran its red light, almost collided with the unmarked police car and continued northbound.

The police vehicle turned on Park Avenue to chase the minivan. There were no markings on the minivan to indicate that it was a livery cab and the officers could not see inside the van to tell if there were passengers because the windows were tinted. The officers placed a red bubble light on their windshield and signaled the vehicle to pull over. As the minivan pulled over to the curb, the front passenger door opened and defendant leaped out and bolted toward the adjacent housing project. As soon as defendant exited the vehicle he started grasping, with one hand, at his waist area. From the way defendant positioned his arm, his elbow protruding as his unseen hand seemed to reach into the waist area, when compared with the other arm swinging in line with defendant's running gait, Dietrich concluded he carried a firearm. Officers Fischer and Dietrich exited their vehicle and chased after defendant. Packtor approached the minivan and found three other occupants, one apparently the driver.

While Dietrich was pursuing defendant, he observed defendant remove what appeared to be a gun from his waistband area. Dietrich slowed down in order to remove his own weapon and he lost sight of defendant for a few seconds as the latter turned the corner. When Dietrich reached the corner he observed defendant entering a building at 1581 Park Avenue.

Without an access code or a key, Dietrich was unable to gain access to the building. He radioed a description and location, including the possibility of a firearm, and was soon given access by passing housing officers.

Officer Andrew Dwyer of the Housing Bureau and Sergeant Galvin responded to the transmission and began searching one of the stairwells in the building. Dwyer heard a loud argument on the eighth floor. He looked through the window of the stairwell door on the eighth floor and saw defendant, who matched the transmitted description, standing outside the door to apartment 8E and having a loud argument with someone within the apartment. The door to the apartment was slightly open. As Dwyer emerged from the stairwell, defendant pushed his way into the apartment and tried to slam the door shut. The officers placed their foot on the doorway and succeeded in pushing the door open. During the pushing, Dwyer heard a metallic scraping sound just inside the apartment near the door. They removed defendant to the hallway as Dietrich arrived. Dietrich immediately recognized defendant. A radio scanner, ski mask and bulletproof vest were recovered from defendant's person. Dietrich testified that the scanner, which was adjusted to the local precinct's channel, is of the type used to monitor police transmissions.

A woman and her young son were found inside the apartment. She stated that defendant did not reside in the apartment. Two semi-automatic handguns, one a .40 caliber with a laser sight, and a 9 millimeter, were recovered from the oven which was located about three feet from the apartment door.

In the indictment, defendant was charged with criminal possession of a weapon in the second and third degrees and unlawful wearing of a body vest. Defendant moved to suppress the physical evidence and identification testimony. A combined *Mapp/Dunaway* hearing was held.

The motion court credited the testimony of the police officers and found that the officers were justified in stopping the vehicle based on the traffic infraction but that they did not have a right to pursue defendant since there was no suspicion of criminality at the moment of the pursuit. The court reasoned that it was clear that defendant was not the driver of the vehicle, as he exited from the passenger side, and since there was no reasonable cause to believe defendant had engaged in a crime, the police were not warranted in pursuing him. The court then suppressed all seized physical evidence and the subsequent identification as fruits of the illegal pursuit.

The court found that defendant was a passenger, and that point is not disputed. What is in issue is what was reasonably apparent to the officers as they first became involved in a highly suspicious and very fast-developing situation. Although, of course, the People bear the burden of establishing the legality of police conduct in the first instance (*People v Berrios*, 28 NY2d 361, 367), the People satisfied that burden as a matter of law.

Initially, police are entitled to take a range of actions with respect to citizens depending on the propriety of the factual predicate for the particular action taken (*People v Hollman*, 79 NY2d 181; *People v De Bour*, 40 NY2d 210). In evaluating the relation between the factual predicate and the action taken, we have characterized "[t]he touchstone in each case [as] the reasonableness of the police conduct in light of the particular circumstances giving rise to the police intrusion" (*People v Cartagena*, 189 AD2d 67, 70, *lv denied* 81 NY2d 1012). Flight, combined with other specific circumstances indicative of illegality, may justify pursuit (*People v Matienzo*, 81 NY2d 778), though flight alone, even combined with circumstances supporting a right of inquiry, may be an insufficient basis for pursuit (*People v Holmes,* 81 NY2d 1056, 1058; *People v Hollman*, *supra*, at 190). The principle is also well established for the passenger of a livery vehicle who exits the vehicle without having apparently engaged in unlawful activity (*see*, *People v Robbins*, 83 NY2d 928, 930; *People v Campbell*, 245 AD2d 191), traffic infractions being attributable to the driver rather than the passenger (*see*, *People v Giboyeaux*, 49 AD2d 519). If flight under innocuous circumstances justified pursuit, then, as the Court of Appeals expressed the concern in *Holmes*, the right to inquire would be tantamount to the right to seize. However, defendant's conduct was neither equivocal nor innocuous. Whether defendant appeared to the pursuing officers to be a mere passenger rather than the driver is, contrary to the motion court's findings, not established in the record. Moreover, there is no basis to reject the testimony that the vehicle was not apparently a livery cab, thus distinguishing these facts from those in *Robbins* (*supra*) and our holding in *Campbell* (*supra*).

The officers' reaction was not motivated only by defendant's unexplained flight. Rather, Dietrich and Fischer responded in the context of a speeding car with tinted windows flying through a red light, almost crashing into them, during the early morning hours, circumstances objectively guaranteed to elicit suspicion among any reasonably attentive police officers.

Since the motion court found the officers' testimony credible, there is no evidence indicating that the pursuit and stop of the van was other than as described—motivated by highly suspicious, and unexplainable, activity that at the least required a traffic stop and would have supported a summons. A reasonable basis for concern was exacerbated by the tinted windows that completely obstructed their view inside the vehicle, and the fact that this incident occurred late in the night. However, if defendant had not bolted, insofar as the driver's paperwork seems to have been in order, one may surmise that no further seizure would have occurred. At that point, of course, the officers had no way of knowing that more than a single person occupied the van. Hence, they had no way of knowing that defendant was not the driver. Parenthetically, a driver in flight might well logically exit on the side nearest his direction of flight for an expedient getaway. Here, the passenger side was to the curb directly leading to the apartment complex into which defendant conveniently fled. It would take a matter of seconds to jump from the driver's side to the passenger seat and out the door. Certainly, no observations at that moment indicated the contrary. Hence, despite the present characterization to the contrary, it was not at all implausible that the exiting defendant may have been the driver. In the split second that Dietrich had to react, for all he knew he was pursuing the driver who had been validly stopped.

Once Dietrich, an experienced anti-crime officer, saw defendant apparently grab onto a weapon in his waistband, this, of course, would be a valid and independent basis for a stop. Hence, the analysis depends on the reasonableness of the officers' conduct during that moment when defendant sprang from the car. I fail to see how reasonable police officers under these circumstances could respond otherwise. This was not just someone merely standing on a corner who chooses to leave speedily as police are espied—the scenario in *Holmes*. In *Holmes*, police approached a group of men in a drug-prone location. As the Court of Appeals described it, "[d]efendant was merely observed in the daytime, talking with a group of men on a New York City street" (*id.*, at 1058). Defendant, who otherwise and in full view of police acted innocuously, ran. Police pursued. During the course of the flight, defendant discarded contraband. Even the fact that defendant had a noticeable, though unidentifiable, bulge in his jacket pocket did not salvage the results of a pursuit that was unreasonable at its inception. As the Court of Appeals noted, "a pocket bulge, unlike a waistband bulge, 'could be caused by any number of innocuous objects'" (*id.*). Here, defendant was in apparent flight from police because of

very dangerous illegal conduct. Arguably, the officers were obliged to pursue defendant to clarify what had happened—such need for clarification being eclipsed, of course, by the observation as defendant alighted the car, grasping at his waist area, that he likely had a handgun. This is not a scenario invoking a citizen's unfettered right to flee. Within the realm of reasonable jurisprudence one necessarily must ask, what else would a reasonable and responsible police officer do? The police should not be required to first approach the vehicle with tinted windows after defendant already bolted out the front passenger door to first ascertain whether defendant was the driver before pursuing him.

Accordingly, I would reverse, deny the suppression motion and remand for further proceedings.