OPINION OF THE COURT
Gtjstin L. Reichbach, J.
The defendant, charged with criminal possession of a weapon (Penal Law § 265.02), moves to suppress (CPL 710.20), claiming that the gun was recovered as a consequence of over-reaching police conduct based neither on probable cause nor reasonable suspicion. (People v De Bour, 40 NY2d 210 [1976]; Dunaway v New York, 442 US 200 [1979].) A Dunaway/Mapp hearing was held on April 2, 2008. The court makes the following findings of fact and conclusions of law.
Findings of Fact
At the hearing, Police Officer Martin Farber, assigned to anti-crime patrol in the 83rd Precinct, was the sole witness. The court finds Officer Farber to be credible in his narrative of how the events unfolded that evening. Indeed, the essential facts are not in dispute. Detective Farber, while on anti-crime patrol in the neighborhood, was seated in the front seat of an unmarked police vehicle on May 18, 2007. His partner was driving and his sergeant was seated in the rear. At approximately 11:15 p.m., Officer Farber’s car was traveling south on Central Avenue, when Farber observed two young males on a bicycle, traveling northbound on Central Avenue. Central runs one way southbound and the males on the bicycle were traveling the wrong way on this one-way street. The defendant, the passenger, was standing on bicycle pegs in the rear of the bike while the other unapprehended individual was seated in front, pedaling and steering the bicycle.
The officer testified that because the bicycle was traveling the wrong way on a one-way street, the bicyclist and his passenger were ordered to stop.[1] When the bicycle got within 5 to 10 feet of the officers, who had by then exited their car, the defendant, who was the passenger, alighted from his perch on the back of the bike and ran away from the officers, heading south on *739 Central Avenue. The bicyclist continued to pedal his bicycle past the officers, continuing to head northbound the wrong way on Central. Without further discussion (tr at 8),[2] Officer Farber and his sergeant gave chase to the passenger on foot, with the police car in pursuit as well. The defendant was ultimately apprehended two blocks away when the police car cut off his route of escape.[3] Officer Farber testified that during the course of this short foot chase, while he was behind the defendant, he saw the defendant reach under the front of his sweatshirt and discard an object. The object hit the concrete in a backyard with a metallic sound. The defendant was apprehended shortly thereafter and a gun was retrieved from the backyard where the defendant had purportedly discarded it.
Officer Farber acknowledged that the defendant was not the one pedaling or steering the bicycle. The officer stated his belief that as a passenger on a bicycle going the wrong way on a one-way street, the passenger, as well as the bicyclist, were both subject to citation under the Vehicle and Traffic Law. Neither the officer nor the District Attorney was able to cite any section of the Vehicle and Traffic Law that would make the passenger jointly liable with the driver for this violation, and this court is unable to find any authority that might support such a claim.
Anti-crime officers and their sergeants are generally not engaged in writing Vehicle and Traffic Law summonses and certainly not for errant bicyclists. There can be no other reasonable conclusion but that these officers had other investigatory concerns in mind when they ordered the bicycle to stop. Officer Farber testified candidly that the only thing that aroused his suspicion about the defendant, and the reason he gave chase, was because the defendant fled after the officers ordered the bicycle to stop. Indeed, in this case their “instincts” proved accurate.
Question Presented
The threshold question presented is whether or not the officers lawfully pursued the defendant. This turns upon whether or not the defendant, as the passenger, had joint liability with the driver of the bicycle under the Vehicle and Traffic Law for the infraction of operating a bicycle the wrong way on a one-way street, or whether his flight alone gave the officers reason *740 able suspicion to pursue. Finally, the court must determine if the defendant’s discarding of the gun during the chase was spontaneous, precipitated by, and a direct consequence of the improper pursuit.[4]
Discussion
Our Court of Appeals has not hesitated to find greater protection for the fundamental right of privacy under article I, § 12 of the New York Constitution than the federal courts have found under the Fourth Amendment. (See People v Scott, 79 NY2d 474, 491 [1992].) Yet in the area of pretextual traffic stops, our highest Court has, regrettably, in this court’s view, chosen to adopt as a matter of state law the federal holding in Whren v United, States (517 US 806 [1996]). In New York, the law now permits an officer to conduct a “pretext” stop of an automobile, so long as there is probable cause to believe the driver has committed a traffic infraction. (People v Robinson, 97 NY2d 341 [2001].)[5]
*741 Only a small number, about 10%, of these investigatory encounters, actually result in an arrest. (See 1999 Atty Gen Stop & Frisk Rep, at viii-ix [hereinafter Attorney General Report].) Ninety percent of these stops are not subject to judicial review. It is only in those limited instances where seizures of contraband actually occur that the courts are confronted with having to review the legality of police conduct. Goaded by a sensationalist press, why, it is asked, fault the police when their actions prove fruitful? It is hard for the public to fully appreciate the essential importance of the exclusionary rule. Our constitutional framework established an independent judiciary because our founders valued principle above expedience.
It is a matter of established constitutional doctrine that Fourth Amendment violations are not cured by the subsequent discovery of contraband; to the contrary, the contraband seized in such circumstances must be suppressed. (People v Van Horn, 76 AD2d 378 [2d Dept 1980]; People v Sobotker, 43 NY2d 559 [1978].) This is in recognition that “[t]he security of one’s privacy against arbitrary intrusion by the police — which is at the core of the Fourth Amendment — is basic to a free society.” (Wolf v Colorado, 338 US 25, 27 [1949], overruled on other grounds by Mapp v Ohio, 367 US 643 [1961].) Police action, even if supported by nothing more than a hunch, can turn out to be prescient. However successful, hunches cannot retroactively justify police conduct that was improper at its inception. (Cf. People v Johnson, 30 NY2d 929 [1972].)
*742 Recent statistical studies have confirmed the claim that minorities are significantly more likely to be subject to such investigatory stops by the police. (See Attorney General Report, supra;[6] Gelman, Kiss and Fagan, An Analysis of ike NYPD’s Stop-and-Frisk Policy in the Context of Claims of Racial Bias [2004] ;[7] Ridgeway, Rand Technical
*743 Report: Analysis of Racial Disparities in the New York Police *744 Department’s Stop, Question and Frisk Practices [2007] [hereinafter Rand Report].)[8] Part of this disparity may be attributable to the fact that those stop rates reflect rates of stops in disproportionately high-crime areas, which in New York City, tend to have a high percentage minority population. (Fagan Analysis at 1.) While there may be some legitimate factors that explain differences in frisk rates between Black and White suspects, even when adjusted for variables, these studies all conclude that disparities are still evident. And most interestingly, these studies reveal that while the police are disproportionally stopping all minorities, stops of Whites are more ef *745 ficient and more likely to lead to an arrest, suggesting they used less rigorous standards in stopping minorities. (See Fagan Analysis at 14.) The sobriquet for pretext automobile stops, “DWB” (driving while black), which has achieved folklore status in minority communities, appears, based on these studies, to be statistically supported.
This case presents a variation on the more typical pretextual traffic stop now permitted under state law. The stop here could more accurately be characterized as “BWB”: bicycling while black. And while New York has now sanctioned the stopping of a vehicle under the pretext of a traffic violation to provide an opportunity for further investigation, unless there is reasonable suspicion to detain a passenger, a passenger is permitted to leave the scene of such a stop. (People v Antelmi, 196 AD2d 658 [2d Dept 1993]; People v Perez, 149 AD2d 344 [1st Dept 1989].) Similarly, a pedestrian stopped for an inquiry without reasonable suspicion has the right to simply walk away. (People v Holmes, 81 NY2d 1056 [1993].)
Whether this bicycle stop is analyzed under New York law as a vehicle stop or a pedestrian stop, on the facts presented, the officers were not justified in pursuing the defendant. The courts have recognized that pursuit of an individual “significantly impedes” the person’s freedom of movement and thus must be justified by reasonable suspicion that a crime has been, is being, or is about to be committed. (People v Martinez, 80 NY2d 444, 447 [1992]; People v De Bour at 216; People v Bennett, 170 AD2d 516 [2d Dept 1991].) The law is clear that flight alone is an insufficient indication of criminality and it must be combined with other specific circumstances indicating that the suspect may be engaged in criminal activity before reasonable suspicion arises to detain or pursue. (People v Sierra, 83 NY2d 928 [1994]; People v Howard, 50 NY2d 583 [1980].)
In Sierra, the Court reviewed two cases, one involving a pedestrian stop, the other involving a passenger in a vehicle. The Court found that the observation of a pedestrian’s actions involved in apparent drug activities combined with his flight, supported a finding of reasonable suspicion, allowing the police to pursue. By way of contrast, in People v Robbins, decided with People v Sierra (supra), the officer stopped a livery cab for a defective taillight. The defendant, the passenger, exited the vehicle, grabbed at his waistband and fled. The Court of Appeals found these facts insufficient to support a determination of reasonable suspicion allowing the officers to pursue the defendant. *746 Consequently, the evidence seized was suppressed. See also People v Campbell (245 AD2d 191, 193 [1st Dept 1997]), which held that “[w]ithout more, the stopping of a vehicle . . . does not justify the detention of a passenger.” There, the police had stopped a livery cab that had gone through a red light and improperly detained the passenger, leading to the suppression of the evidence which had been seized.
While the law is settled that upon making a valid stop of a motor vehicle for a traffic violation, the police may order the driver and all passengers out of the vehicle until the stop is concluded (People v McLaurin, 70 NY2d 779 [1987]), the courts recognize that attempted flight from the scene, without more, carries no indicia of criminality. (Cf. People v Forbes, 283 AD2d 92, 96 [2d Dept 2001].) In Forbes there was more to support the actions taken. The police heard the racking of a gun and therefore were found to be justified in searching the defendant. (See also People v Antelmi, supra; People v Greene, 135 AD2d 449 [1st Dept 1987].)
Courts have not found reasonable suspicion and will suppress evidence where, after a police stop of a vehicle in which a passenger is traveling, the passenger merely attempts to walk or run away. (People v Perez, 149 AD2d 344 [1st Dept 1989].) In Perez, the police were following a car, without a rear license plate, which stopped of its own accord. The passenger exited, looking nervous and fidgeting, holding a plastic bag. The police ordered the passenger to stop but he continued to walk away. The pursuing officer gave chase, caught up with him and examined the bag, finding a large quantity of cocaine. The Court held that just the fact that the defendant exited the car carrying an opaque container and then walked away from the scene did not constitute a basis for further pursuit by the police. In People v Giboyeaux (49 AD2d 519 [1st Dept 1975]), the defendant was a passenger in a car stopped by the police to check the driver’s license and registration. The driver had not yet registered the car, but produced paper work to show he was the rightful owner. Despite this, the police arrested both the driver and the passenger and discovered a handgun in the passenger’s coat pocket. The Court found that if there had been any violations, they were attributable solely to the driver and the passenger was therefore illegally detained and searched. In the instant case, if there was any violation established, it too is attributable solely to the bicyclist. The Vehicle and Traffic Law holds drivers, not passengers, responsible for the operation of the vehicle.
*747 Reasonable suspicion is created only when a passenger engages in conduct in addition to flight and that additional conduct coupled with flight enables the police to pursue and stop him. In People v Rivera (286 AD2d 235 [1st Dept 2001]), the defendant was a passenger in a car that narrowly missed colliding with a police car. Upon stopping the car, the passenger immediately jumped out and ran, grasping his waist area. The Court held that this “telltale sign” of a weapon gave police reasonable suspicion. (But see People v Sierra, supra [where grabbing a waistband and fleeing were found insufficient to give rise to reasonable suspicion].)
In discussing the rights of pedestrians who flee at the approach of police, and the authority of the police to pursue them, the courts have held that flight alone, or even in conjunction with equivocal circumstances that might justify a police request for information, could not serve to create a reasonable suspicion of criminality given the defendant’s right “to be let alone and to refuse to respond to police inquiry.” (See People v May, 81 NY2d 725, 728 [1992] [internal quotation marks omitted]; People v Holmes, supra; see also People v Lobley, 31 AD3d 1161 [4th Dept 2006].)
In the instant case, it is undisputed that there was nothing other than the defendant’s flight that caused the officer to pursue. Since there is no provision in the law that would make a passenger on a bicycle liable with the operator for bicycling the wrong way down a one-way street, the police had no probable cause to arrest this defendant. His flight, without any other suspicious conduct, did not give rise to the quantum of reasonable suspicion that would permit the officers to pursue him.
In their latest submission, the People argue for the first time that the evidence should not be suppressed because even if the police pursuit had been undertaken without reasonable suspicion the defendant abandoned the gun in a calculated act sufficiently attenuated from the police stop and pursuit. (People v Boodle, 47 NY2d 398 [1979].) The courts have held that a calculated decision to abandon contraband can attenuate the seizure from the initial police illegality. (People v Martin, 140 AD2d 632 [2d Dept 1988]; People v Williams, 137 AD2d 568 [2d Dept 1988].) The test is whether the defendant’s action was spontaneous and precipitated by the initial illegality or whether it was a calculated act not provoked by such activity and thus attenuated from it. (People v Wilkerson, 64 NY2d 749 [1984].) On the facts presented here, there can be no other conclusion *748 but that the action of the defendant, as he was being pursued by two officers on foot and by a patrol car, was a spontaneous reaction to the sudden, unexpected confrontation with the police and the ensuing pursuit. (People v Bennett, 170 AD2d 516 [2d Dept 1991].) Here, as in Wilkerson (supra), there is no support for finding that the defendant’s actions were a calculated and considered response to police intrusion. The defendant took flight immediately upon being asked to stop by the police and the police pursuit ensued immediately, lasted only a few moments and proceeded for less than two blocks.
It is well established that if evidence is discovered as a direct consequence of unlawful police conduct, it must be suppressed. (People v Boodle, supra; People v Wilkerson, supra; see also People v Terracciano, 135 AD2d 849 [2d Dept 1987].) In Terracciano, three police officers were undercover in an unmarked vehicle when they observed the defendant carrying two objects in his hands. Upon the police telling him to stop, the defendant fled and threw the objects he was carrying. The objects turned out to be stolen property. Finding that the approach by the officers was based on a mere hunch and not upon any specific facts sufficient to justify police action, the Court held that the police had no right to stop the defendant. The Court further concluded that the defendant’s action in discarding the property upon being approached by the police was a spontaneous reaction to a sudden and unexpected confrontation. There, as here, the defendant’s conduct in discarding the property while in hot pursuit by the police was not attenuated from, but was rather a direct consequence of, the unlawful police conduct. (Id. at 851; see also People v Howard, supra; People v Torres, 115 AD2d 93 [1st Dept 1986].) Both Howard and Torres involve the discarding of contraband during the course of an unwarranted police chase. The courts found that because there was no lawful basis for the pursuit and, “guided by the principle that a presumption exists against the waiver of constitutional rights,” held that the act of throwing away contraband in such circumstances is “Vindicative of a spontaneous response . . . , reactions provoked by the coercive pressure of the illegal conduct.” (Torres at 99; Howard at 593.)
Conclusion
The defendant, as the passenger on the bicycle, was not liable for the Vehicle and Traffic Law violation of operating a bicycle the wrong way on a one-way street. Thus, there was no prob *749 able cause to arrest him for violating the Vehicle and Traffic Law. His flight alone, the only factor identified by the police as the reason for pursuing him, was insufficient to give rise to the reasonable suspicion required to permit police pursuit. The defendant’s discarding of the weapon in the course of the immediate chase was spontaneous, precipitated by and a direct consequence of this improper pursuit. As a result, the weapon must be suppressed.

. Vehicle and Traffic Law § 1231 provides: “Every person riding a bicycle . . . upon a roadway . . . shall be subject to all of the duties applicable to the driver of a vehicle.”

. “Tr” followed by a number indicates the page of the hearing transcript.

. The officer did not explain why he chose to pursue the passenger rather than the actual cyclist who was continuing to operate the hike in violation of the Vehicle and Traffic Law.

. The District Attorney, in its first posttrial submission, improperly attempted to introduce additional claims by which the People sought to justify the stop and pursuit of the defendant. Such claims are dehors the record and cannot be considered. Upon a subsequent submission, new counsel for the People argues, through a strained reading of the officer’s testimony, that the officer made out on direct and cross-examination an additional ground to stop the bike and the passenger, to wit: that the passenger was subject to arrest for violating Vehicle and Traffic Law § 1232 which provides: “(b) No bicycle shall be used to carry more persons at one time than the number for which it is designed and equipped.” (Emphasis added.) There appears to be no definition in the statute as to what constitutes a bicycle designed to lawfully carry a passenger. There was absolutely no evidence presented at the hearing to demonstrate that this particular bicycle was not designed to carry a passenger. The only evidence on this issue was that the bike had rear pegs that are designed for a passenger to stand upon.

. The great Justice Oliver Wendell Holmes, in his classic treatise on the common law, observed that “[t]he life of the law has not been logic; it has been experience.” (O.W Holmes, Jr., The Common Law, at 1 [1881].) No doubt there is logic in adopting an objective standard, i.e., whether there is probable cause for a traffic stop, rather than trying to divine subjective motivations when it is claimed that a vehicle and traffic violation stop is a pretext for the officer, whose primary motivation is to conduct another investigation. However, the experience in practice of this “objective” standard has unintended consequences regarding the essential need for mutual respect for the rule of law. As the dissent in Robinson notes, pretext traffic infraction stops have a dramatic
“disproportionate impact on young African-American males (see, Harris, Car Wars: The Fourth Amendment’s Death on the Highway, [66 Geo Wash L Rev 556, 577]; Abramovsky and Edelstein, Pretext Stops and Racial Profiling After Whren v. United States: The New York and New Jersey Responses Compared, 63 Alb L *741 Rev 725; Harris, ‘Driving While Black’ and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops, 87 J Grim L & Criminology 544).” (Robinson at 366 [Levine, J., dissenting] [additional citations omitted].)
While this court is aware of the limitations of anecdotal experience rather than hard statistical fact, this court has tried hundreds of cases and interviewed thousands of prospective jurors. Jury panels are composed of citizens from throughout the borough without disqualifying criminal histories. It is commonplace, when inquiring of prospective jurors’ attitudes about the police, to find a disproportionate number of African-American males recounting being stopped by the police, some multiple times, without, in their view, just cause. .African-American women frequently recount witnessing such encounters. While many acknowledge that these interactions have led them to be skeptical of police testimony, it is less apparent how many are affected by such an attitude but not forthcoming about it. There is no doubt in the court’s mind that this undisclosed skepticism has infected jury deliberations. Racial disparity in stops has provoked a crisis of legitimacy with legal, moral, and political dimensions. (See Wang, Illinois v. Wardlow and the Crisis of Legitimacy: An Argument for a “Real Cost” Balancing Test, 19 Law & Ineq 1 [2001], as cited in Gelman, Kiss and Fagan, An Analysis of the NYPD’s Stop-and-Frisk Policy in the Context of Claims of Racial Bias, at 2 [2004] [hereinafter Fagan Analysis].)

. The Office of the Attorney General commenced an investigation into the New York City Police Department’s use of stop and frisk practice on March 18, 1999. This was the first systematic study of these practices and was based on a quantitative analysis of approximately 175,000 US-250 forms that the police are required to complete after stop encounters. The forms covered stops that occurred in 1998 and in the first three months of 1999. The study employed statistics from police precincts and compared rates at which members of different racial groups were stopped. While it is universally acknowledged that stop and frisk serves as an important tool in furthering NYPD crime fighting strategies, the Attorney General Report focused on the consequences of stop and frisk practice for people in the communities most directly affected. The report’s focus was to determine and compare the extent to which minorities and Whites were the subject of stop and frisk activities and to determine the extent to which officers described a legally sufficient basis for effecting the stop. For the period covered, the report concluded that Blacks were stopped at a higher rate than Whites, relative to their percentage within the New York City population. Blacks, while comprising 25.6% of the city’s population, constituted 50.6% of all persons stopped. By contrast, Whites were 43.4% of the city’s population, but accounted for only 12.9% of all stops. This disparity in stop rates is particularly pronounced in precincts where the majority of the population is white. In those precincts where Blacks and Hispanics each represent less than 10% of the total population, more than half of the total stops during the period came from these groups. The report also notes that precincts where minorities constitute the majority of the overall population tended to see more stop and frisk activity than precincts where Whites constitute the majority. Interestingly, while only one out of nine stops resulted in an arrest, Whites were arrested with more frequency after such stops than minorities. One out of every 9.5 Blacks stopped was arrested, while for Whites there was one arrest for every 7.9 Whites stopped. Acknowledging that higher crime rates in minority communities can explain the higher rate at which minorities are stopped, using various regression analysis adjustments, the Attorney General Report still found that different crime rates alone cannot fully explain the increased rates of stops of minorities. After accounting for the effect of different crime rates, Blacks were stopped 23% more often than Whites across all crime categories. Regression analysis revealed that for specific crime categories there were statistically significant disparities in the stop rates of Blacks versus those of Whites.

. In the aftermath of the Attorney General Report, three noted academics conducted a rigorous statistical study to determine if stop rates accurately reflected the rates of crimes committed by each ethnic group or whether such stop rates reflected elevated rates in specific social areas, such as neighborhoods and precincts. After a complex series of statistical adjustments using a hierarchal multilevel model to adjust for precinct level variability, the report determined that persons of African and Hispanic descent were stopped more *743 frequently than Whites even after controlling for variability in rates of specific estimates of crime participation.
The Fagan Analysis reviews some studies which focused on the extent to which police were stopping people on highways for “driving while black.” {See Weitzer, Racialized Policing: Residents’ Perceptions in Three Neighborhoods, 34 Law & Soc’y Rev 129 [2000]; Harris, Profiles in Injustice: Why Racial Profiling Cannot Work [New Press NY 2002]; Lundman and Kaufman, Driving While Black: Effects of Race, Ethnicity, and Gender on Citizen Self-Reports of Traffic Stops and Police Actions, 41 Criminology [No. 1] 195 [2003].) Also reviewed was the issue of racial bias in pedestrian stops, particularly those targeted for illegal gun possession and drugs.
The police have defended racially disparate patterns of stops on the grounds that minorities commit disproportionately more crimes than Whites and that spatial concentration and disparate impact of crimes committed by and against minorities justify more aggressive enforcement in minority communities. The question presented is whether disparate stop rates reflect disproportionate crime rates or demonstrate targeting by police of minorities at rates beyond what any racial difference in crime rates may justify. Resolution of this question is at the heart of the controversy over racial profiling and discrimination. The Fagan Analysis concentrated on police stop and searches of pedestrians rather than car stops and used for their statistical study the statistics provided by the New York State Attorney General’s office, which were reviewed by the United States Commission on Civil Rights. Its purpose was to compare rates of stops using multilevel modeling to adjust for local variations.
The Fagan Analysis applied a number of tests as they analyzed the data. One was to determine the extent of racial disparity in stops after controlling for specific rates of the targeted behavior in controlled areas. An alternate strategy was to compare hit rates; that is, the proportion of stops that yielded arrest. This approach bypassed the question of who was stopped and for what reason and instead looked only at disparate impacts or outcomes for different groups. Going beyond the statistical models employed by the Attorney General’s office, the Fagan Analysis also performed multilevel analyses using the city’s 75 precincts. They compared and analyzed stops associated with different sorts of crimes, relative rates of stops compared to arrests, and created a model using 12 separate subsets of the data corresponding to four crime types in three categories of precincts based on the percentage of minority populations. The report found that for the most frequent category of stops, those associated with violent crimes and weapon offenses, Blacks and Hispanics were much more likely to be stopped than Whites in all category of precincts. For violent crimes, Blacks and Hispanics were stopped 2.5 times and 1.9 times as often as Whites. And for weapons crimes, Blacks and Hispanics were stopped 1.8 times and 1.6 times more often than Whites. As to what happened as a consequence of these stops, the report found that while the police are disproportionately stopping minorities, the stops of Whites are more efficient and more likely to lead to arrest, where as for Blacks and Hispanics, the police were stopping more indiscriminately and fewer of the people stopped in the broader sweeps were actually arrested. One in 7.9 Whites stopped was arrested as compared to 1 in 8.8 Hispanics and 1 in 9.5 Blacks. The stops of Blacks and Hispanics were less efficient than the stops of Whites, suggesting that the police have been using less rigorous standards with the stopping of minority groups. While the study could only present supporting evidence — not *744 hard and fast conclusions — it did reveal a statistical pattern in which Blacks and Hispanics were stopped more often than Whites but were less likely than Whites to be arrested as a consequence of those stops.
Their report concluded that minority groups were stopped more often than Whites, both in comparison to their overall population and to the estimated rates of crimes they have committed. While unable to conclude that these variations established that the NYPD was engaged in discriminatory practices, it did reveal anomalous statistical patterns.

. The Rand Report, published in 2007 and conducted at the request of the NYPD, analyzed data collected from the police department for stops in 2006. In 2006 the NYPD conducted more than half a million stops, and pedestrians in certain parts of the city were found to have a greater chance of being stopped by the police than in others. Acknowledging that stops not resulting in an arrest may have a valuable public safety function, the 2006 statistics showed that for every stop that resulted in an arrest, nine stops did not. Here again, not only was there a disparity shown in who gets stopped but the 2006 statistics mirrored the earlier finding that overall the police were nearly twice as likely to find contraband when frisking and searching White subjects than when frisking and searching Black subjects. Even when the recovery rate is adjusted, the adjusted rate showed that Whites were arrested after being stopped 5.8% of the time while Blacks were arrested 3.3% of the time after being stopped.
Of the more than half a million police stops of pedestrians in 2006, 89% of them involved a non-White. Forty-five percent of the Black and Hispanic suspects were frisked compared to the 29% of the White suspects; yet, when frisked, White suspects were 70% more likely than Blacks to have a weapon on them. The Rand Institute constructed a complex statistical model involving assessing the racial composition of those participating in criminal activities and the racial composition of those exposed to patrolling officers. The outcome of police stops raw numbers on recovery rates of contraband indicated that the frisk and search of White suspects was much more likely to discover contraband than that of Black suspects.
In its conclusion, the Rand Report found that there were some legitimate factors that explained much of the difference between the frisk rate of Black suspects and the frisk rate of White suspects. It cautioned that raw statistics, while easy to compare, often exaggerate racial disparity. Nonetheless, using statistical adjustment, the Rand Report concluded that the disparities, when adjusted, while smaller than raw statistics would indicate, still reveal racial disparities in the data that are of legitimate concern.