People v Peters (2024 NY Slip Op 50323(U))

[*1]

People v Peters

2024 NY Slip Op 50323(U)

Decided on March 27, 2024

Supreme Court, Kings County

Daniels-DePeyster, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 27, 2024
Supreme Court, Kings County

The People of the State of New York

against
Omar Peters and SHAQUILLE BENJAMIN, Defendant.

Indictment No. 75075-23

ADA Alexis Lightner for DA Eric Gonzalez, Kings County District Attorney
Douglas Rankin, for defendants

Claudia Daniels-DePeyster, J.

The defendants, who are charged with Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03(3)) and other related charges, move to suppress a recovered firearm. On March 6, 2024, this Court conducted a combined Dunaway/Mapp/Ingle/Huntley hearing. The People called two witnesses: Police Officer Steve Orellana and Lieutenant Maldonado. Additionally, the People introduced four exhibits: a disc containing Officer Orellana's body worn camera footage from the scene; a disc containing Officer Orellana's body worn camera footage at the time of an inventory search; a photograph of the recovered firearm; and a disc containing Lieutenant Maldonado's body worn camera footage. The defendant did not present any witnesses or introduce any evidence. 
Based upon the testimony at the hearing, the submissions by the parties and the applicable law, the motion to suppress is GRANTED. I. FINDINGS OF FACT
As a preliminary matter, the Court finds that the witnesses were credible. 
A. Police Officer Steve Orellana
Police Officer Steve Orellana has been with the New York City Police Department (hereinafter "NYPD") for approximately six years and is currently assigned as a Neighborhood Safety Officer in Police Service Area (hereinafter "PSA")2 addressing quality of life situations (Tr. at 8-9,32-33). On July 21, 2023, at approximately 8:56 pm, Officer Orellana was on uniform patrol in an unmarked car with his partners, Lieutenant Maldonado and Police Officer Almanzar, in the vicinity of Blake Avenue and Howard Avenue, in Kings County (Tr. at 9, 32-33). While stopped at a red light on Blake Avenue, Officer Orellana observed a white BMW (hereinafter "the BMW") traveling at a high rate of speed on Howard Avenue (Tr. at 9, 35). He estimated that the BMW was traveling at "around 35 to 40" miles per hour in a 25 mile per hour zone (Tr. at 10). In the BMW, he saw a male passenger with a bright red shirt (Tr. at 9, 35). The officer [*2]turned on his lights and made a right onto Howard Avenue to stop the BMW, at which point the BMW increased its speed and "went onto the service road on Howard Avenue and started to overtake vehicles" (Tr. at 10). The BMW "was swerving in and out of traffic" and went through two or three steady red lights before parking on the corner of Sterling and Howard and throwing a "black bag" (Tr. at 11, 36). On cross examination, Officer Orellana acknowledged that he made no mention of a bag being thrown during his testimony before the grand jury, and that he did not write it in any of his notes or paperwork either (Tr. at 36-37). The officer's vehicle was getting close to the BMW when the BMW took off again (Tr. at 11). The BMW continued down Howard Avenue, turned onto Eastern Parkway, and "kept going around the block:" "it went from Eastern Parkway up to Sterling into Howard and then it turned on Prospect towards Ralph" (Tr. at 12). Once the BMW turned onto Prospect Place it came to a red light where other vehicles were stopped (Tr. at 12). The BMW then turned towards the sidewalk and three occupants ran out (Tr. at 12-13). 
Driver: The first person to exit was the driver (Tr. at 13-14, 37). He was wearing "all black with brown or tan slippers" (Tr. at 13-14). He ran on Prospect Place to Howard Avenue but was not apprehended (Tr. at 14, 38-39).
Rear passenger: The next person to exit the BMW was the rear passenger (Tr. at 14). He exited from the "rear driver's side on the left-hand side" and was wearing a "maroon shirt" (Tr. at 14, 35). This individual was identified at the hearing as defendant Omar Peters (hereinafter "Peters") (Tr. at 14).
Front passenger: The final occupant to exit the BMW was the passenger wearing a "bright red shirt" (id.). He also exited from the driver's side (id.). This individual was identified at the hearing as defendant Shaquille Benjamin (hereinafter "Benjamin") (Tr. at 13-14, 35).
After exiting the BMW, Peters ran on Prospect Place towards Howard Avenue, and Officer Orellana chased him on foot (Tr. at 14-15, 39). According to Officer Orellana, he did not lose sight of Peters during the chase, there was nothing obstructing his view, and there were streetlamps lit, allowing for him to see Peters' face (Tr. at 15). Just a "couple of seconds" later and "five car lengths away," Peters fell, and Officer Orellana apprehended him (Tr. at 15-16). At the hearing, Officer Orellana first said that Peters was merely "detained" on the scene while they investigated, but later said that Peters was under arrest at the scene (Tr. 40-41). When pressed by defense counsel as to what Peters was being arrested for, Officer Orellana said it was for "not stopping. Running away from an officer," and later said it was for obstructing governmental administration, but clarified that he did not believe he had probable cause to arrest Peters for any other crime (Tr. at 40-41).
After apprehending Peters, Officer Orellana walked back towards the BMW and waited for backup (Tr. at 16-17). When Sergeant Grajales arrived, the officer "told him to hold Omar Peters" while he "canvassed for the driver and for anything else thrown out of the vehicle" (Tr. at 16, 42)[FN1]
. Approximately 30 minutes later, when Officer Orellana finished canvassing, he returned to PSA 2, where Peters and the BMW had been taken (Tr. at 20-21, 43)[FN2]
.
Once at PSA 2, the officers learned that the BMW was registered to a "company called [*3]EAN Holdings" in Indianapolis (Tr. at 24, 44). The officers vouchered the BMW and conducted an inventory search during which they recovered "a gun on the rear right passenger" "on top of the seat" with a "roll of Bounty [paper towels] on top of it" (Tr. at 21-22, 24, 44). He took the gun to his gun locker "to safeguard and lock it and wait for the Evidence Collection Team to come to make it safe" (Tr. at 27). He then returned to the BMW to safeguard everything else in the vehicle. The officer said that the items taken out of the vehicle were vouchered but did not specify what items other than the firearm were recovered and vouchered (Tr. at 27). The People did enter body worn camera footage of the inventory search but did not enter any type of voucher or inventory list. When asked what type of police action was taken with respect to Peters after that, the officer said, "he was arrested and charged for the gun" (Tr. at 27-28).
B. Lieutenant Jolene Maldonado
Lieutenant Jolene Maldonado has been with the New York City Police Department for approximately twenty years and is currently assigned as a Special Operations Lieutenant in PSA 2 (Tr. at 46-47). On July 21, 2023, at approximately 8:56 pm, Lieutenant Maldonado was on uniform patrol in an unmarked car with her partners, Police Officer Orellana and Police Officer Almanzar, in the vicinity of Howard Avenue and Sutter Avenue, near the intersection of Blake Avenue, in Kings County (Tr. at 47). She was seated in the front passenger seat (Tr. at 63). The Lieutenant observed a "white BMW traveling at a high rate of speed north on Howard" Avenue (Tr. at 48). The officers activated their lights and sirens and pursued the BMW north on Howard Avenue, past Eastern Parkway (Tr. at 48). The BMW "continued to drive at a high rate of speed taking over several vehicles, failing to yield to pedestrians and disobeying several steady red lights" (Tr. at 48). The BMW then continued north on Howard Avenue before pulling over, entering the roadway again and continuing to drive at a high rate of speed (Tr. at 48). The Lieutenant never lost sight of the BMW while following it (Tr. at 49). The BMW circled the area a few times, and then made a left onto Prospect Place where other vehicles were stopped at a traffic light (Tr. at 48-49). The BMW pulled to the left towards the sidewalk and three occupants fled from the driver's side (Tr. at 50, 62).
Occupant one: ran on Prospect Place towards Howard Avenue (Tr. at 50).
Occupant two: was the front passenger (Tr. at 61). He ran on Prospect Place towards Howard Avenue (Tr. at 50). This occupant was described as a "black male" wearing "a red hoodie, black sweatpants, and . . . red and white sneakers" (id). This occupant was identified at the hearing as Shaquille Benjamin (Tr. at 51). The Lieutenant was about 20 feet away from Benjamin, the street was lit, and there was nothing obstructing her view, allowing for her to see Benjamin's face (Tr. at 50).
Occupant three: ran on Prospect Place towards Ralph Avenue (id).
After the three occupants exited the BMW, the lieutenant chased after Benjamin on foot (Tr. at 51). Benjamin ran up Prospect Place, and after approximately two blocks, made a left onto Sterling, at which point the lieutenant lost sight of Benjamin for approximately 15 seconds (Tr. at 51-53). At this point, the lieutenant transmitted over the radio that she lost sight of Benjamin and gave his location, when Benjamin emerged from in between a parked car on Sterling Street and took off running towards Howard Avenue (Tr. at 52-54). The lieutenant shouted at Benjamin to stop and transmitted over the radio to responding units his location and the direction of flight (Tr. at 53). Responding units were then able to apprehend Benjamin (Tr. at 54). The entire chase, up until Benjamin's apprehension lasted approximately two minutes (Tr. 54). Benjamin was handcuffed but the lieutenant gave conflicting testimony as to whether [*4]Benjamin was under arrest:
She initially stated that there was no official police action taken against Benjamin at the scene, as the police were "conducting an investigation," that Benjamin was not under arrest at the scene, but merely being detained, and that Benjamin was arrested at the precinct after the inventory search, but she later said that Benjamin was under arrest at the scene for obstructing governmental administration (Tr. at 55, 57, 63-70, 69).
After Benjamin was removed from the scene, the lieutenant "continued to canvass the area for the other un-apprehended driver and evidence" though she did not see anything discarded from the BMW (Tr. at 55, 68). After approximately 30 minutes, she returned to the precinct where she "assisted the officers in doing an inventory search of the [BMW]" (Tr. at 55-57). During the search, a "black firearm" was recovered. There was no testimony as to anything else being recovered, inventoried or vouchered (Tr. at 57).
II. CONCLUSIONS OF LAW
On a motion to suppress evidence, the prosecution has the initial burden of going forward to demonstrate the legality of the police actions and must introduce credible evidence to meet this burden (People v. Hernandez, 40 AD3d 777 [2d Dept, 2007]; see People v. Berrios, 28 NY2d 361, 369 [1971]).
The Court makes the following conclusions of law:
A. Dunaway/Mapp/Ingle
For the Dunaway/Mapp/Ingle prong of this hearing, the initial burden of proof rests with the People to put forward credible evidence tending to show that law enforcement acted lawfully, and the defendant has the burden of proving by a preponderance of the evidence that the police acted unlawfully (see People v. Baldwin, 25 NY2d 66 [1969]; see People v. Parker, 180 AD3d 1072 [2d Dept, 2020]). The Court must determine whether the police action was "justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place" (People v. Wheeler, 2 NY3d 370, 374 [2004]).
To assess the propriety of a street encounter with police, the Court must employ the four-tiered framework set forth in People v. DeBour (40 NY2d 210 [1976]) and reaffirmed in People v. Hollman (79 NY2d 181 [1992]). Each progressive level under this framework "authorizes a separate degree of police interference with the liberty of the person approached and consequently requires escalating suspicion on the part of the investigating officer" (id. at 185). "The justification for each escalation is based on the totality of the circumstances at the moment the escalation occurs, building on the officer's prior observations and actions of both the officer and the private individual" (People v. Johnson, 40 NY3d 172, 179 [2023]).
Level One — Request for Information: Law enforcement may engage in minimally intrusive questioning to request information "when there is some objective credible reason for that interference not necessarily indicative of criminality" (DeBour, 40 NY2d at 223). The request for information cannot be based on conduct that is otherwise innocent and "must be predicated on more than a hunch, whim, caprice or idle curiosity" (People v. Ocasio, 85 NY2d 982, 985 [1995]). A level one request for information must be limited to "basic, non-threatening questions" regarding, for example, address, destination, or identity (People v. Kennebrew, 106 AD3d 1107, 1109 [2d Dept, 2013]). An individual does have the right to walk away without responding (see People v. Howard, 50 NY2d 583 [1980]).
Level Two — Common Law Right of Inquiry: Law enforcement is permitted "to gain explanatory information. . . short of forcible seizures" upon a "founded suspicion that criminal [*5]activity is afoot" (DeBour, 40 NY2d at 223). A level two intrusion would involve more pointed questions that would reasonably lead the person approached to believe that they are suspected of some wrongdoing (Kennebrew, 106 AD3d at 1109).
Level Three — Reasonable Suspicion: Permits "a forcible stop and detention" but requires the officer to have "a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor" (DeBour, 40 NY2d at 223). Reasonable suspicion is defined as the "quantum of knowledge sufficient to induce an ordinarily prudent and cautious person under the circumstances to believe criminal activity is at hand" (People v. Martinez, 80 NY2d 444 [1992], citing People v. Cantor, 36 NY2d 106 [1975]). However, "innocuous behavior alone will not generate a founded suspicion that a crime is at hand" (Kennebrew, 106 AD3d at 1109; see People v. Brannon, 16 NY3d 596, 602[2011]("reasonable suspicion requires specific and articulable facts which, along with any logical deductions, reasonably prompted the intrusion" [emphasis added])). An effect of this right to temporarily detain is the "authority to frisk if the officer reasonably suspects that [they are] in danger of physical injury by virtue of the detainee being armed" (DeBour, 40 NY2d at 223; see People v. Carney, 58 NY2d 51 [1982](a police officer with knowledge of facts indicating that the individual is armed or dangerous may frisk a suspect)). 
Level Four — Reasonable Cause: Law enforcement may arrest and take a person into custody when that officer "has reasonable cause to believe that person has committed a crime, or offense in [the officer's] presence" (id.).
Moreover, it is also well established that "flight, combined with other specific circumstances indicating that the suspect may be engaged in criminal activity [can] provide the necessary predicate for police pursuit" (People v. Holmes, 81 NY2d 1056, 1058 [1993]; see People v. Sierra, 83 NY2d 928, 929 [1994]("A defendant's flight in response to an approach by the police, combined with other specific circumstances indicating that a suspect may be engaged in criminal activity, may give rise to a reasonable suspicion, the necessary predicate for police pursuit")).
The framework set forth in De Bour "for evaluating the constitutionality of police-initiated encounters with private citizens applies with equal force to traffic stops," whether the vehicle is moving or parked (People v. Garcia, 20 NY3d 317[2012]; see People v. Hinshaw, 35 NY3d 427[2020]; see People v. Harrison, 57 NY2d 470[1982]). While "valid traffic related issues are widely regarded as the less intrusive level-one inquiry," "interference with a moving vehicle is a seizure requiring, at a minimum, reasonable suspicion" (People v. Perez-Lopez, 29 Misc 3d 1218(A)[Sup. Ct. Bx. Co, 2010]; see People v. May, 81 NY2d 725[1992]).
It is well settled that the police may lawfully stop a vehicle where the officer has reasonable suspicion to believe that the driver violated the Vehicle and Traffic Law (see People v. Ingle, 36 NY2d 413, 415 [1975]("A single automobile traveling on a public highway may be stopped for a 'routine traffic check' when a police officer reasonably suspects a violation of the Vehicle and Traffic Law")). This is true even if the stop is made by officers not assigned to traffic duty (see e.g., People v. Woods, 64 NY2d 736 [1984](traffic stop for expired registration made by anti-crime unit)). Additionally, "a police officer may, as a precautionary measure and without particularized suspicion, direct the occupants of a lawfully stopped vehicle to step out of the car" (People v. Garcia, 20 NY3d 317 [2012]).
However, unless there is reasonable suspicion to detain the passenger of a vehicle stopped for a violation of the Vehicle and Traffic Law, a passenger is permitted to leave the [*6]scene of such a stop (see People v. Antelmi, 196 AD2d 658 [1993]). Moreover, Courts have recognized that a passenger's flight or attempted flight from the scene, without more, carries no indicia of criminality. "Reasonable suspicion is created only when a passenger engages in conduct in addition to flight and that additional conduct coupled with flight enables the police to pursue and stop him" (People. Lopez, 20 Misc 3d 737 [Sup. Ct. King Co. 2008](passenger on bicycle fled after bicycle was stopped for traveling the wrong way on a one way street; no reasonable suspicion to pursue passenger without other suspicious conduct); see People v. Miller, 212 AD3d 735 [2d Dept, 2023](no reasonable suspicion that defendant was involved in criminal activity solely because he attempted to flee the backseat of vehicle stopped for a traffic infraction); see People v. Perez, 149 AD2d 344 [1st Dept, 1989](passenger of vehicle stopped for traffic infraction walked away while appearing fidgety and holding a plastic bag later discovered to contain cocaine, pursuit not justified)).
There is no question that the officers here were authorized to stop the BMW, as they observed the driver commit multiple traffic infractions (e.g., speeding, failing to stop at a traffic control device, reckless driving). However, there was no testimony of the defendants committing any traffic related infraction as the passengers, such as, for example, failing to wear a seatbelt. Therefore, the threshold matter is whether the officers were justified in their pursuit of the passengers. This Court finds that they were not.
There was no reasonable suspicion to believe the defendants were committing, had committed or were about to commit a crime. There was nothing other than the defendants' flight that caused the officers to pursue them: there was no testimony of a bulge at either defendants' waistband, any indication that either defendant was reaching for, grabbing at, or adjusting his waistband, or attempting to conceal a weapon (see People v. White, 159 AD3d 741 [2d Dept, 2018]; see People v. Clermont, 133 AD3d 612, 614 [2d Dept, 2015](defendant's "constant adjustments" to his waistband "did not constitute specific circumstances indicative of criminal activity so as to establish the reasonable suspicion that was necessary to lawfully pursue the defendant, even when coupled with the defendant's flight from the police"); see People v. Furrs, 149 AD3d 1098, 1100 [2d Dept, 2017](observations that defendant exited vehicle and held his waistband did not constitute circumstances indicative of criminality even when coupled with his flight from the police); but see People v. Rivera, 286 AD2d 235 [1st Dept, 2001](passenger of vehicle stopped for traffic infraction ran away grasping his waist area was "telltale sign" of a weapon; reasonable suspicion found)).
While flight "accompanied by the deliberate discarding of incriminating evidence justifies reasonable suspicion that a crime has been or is about to be committed" the testimony as to the black bag alleged by Officer Orellana to have been tossed was equivocal: there was no testimony as to who threw the bag, either one of the defendants or the driver, or what window it was thrown from, either the driver side or passenger side (People v. Campbell, 245 AD2d 191 [1st Dept, 1997]). There was also no testimony at the hearing, such as a clinking sound, or the appearance of a heavy or L shaped object, that would suggest that the bag, even if actually thrown from the car, contained any contraband. Additionally, Lieutenant Maldonado said that she did not see anything tossed.
Under these circumstances, the officers lacked reasonable suspicion to pursue the defendants and the pursuit and subsequent detainer of the defendants was unlawful. As the firearm recovered from the vehicle was a direct consequence of unlawful police conduct, it must be suppressed (see People v. Broodle, 47 NY 398 [1979]).
B. Huntley
A statement made by a defendant may not be used against him during a criminal trial unless it is proven beyond a reasonable doubt that the statement was voluntarily made (see CPL § 60.45[1]; see People v. Grillo, 176 AD2d 346 [2d Dept 1991], citing People v. Huntley, 15 NY2d 72 [1965]). A statement is deemed to be "involuntary" if it was coerced by the use or threatened use of physical force, or improper conduct or undue pressure "which impaired the defendant's physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement" (CPL § 60.45[2][a]). In a challenge to the voluntariness of a statement, the court must examine the totality of the circumstances under which the statement is made, including the characteristics of the accused and the circumstances under which the statement was made, including: the duration and conditions of the detention, the age, physical state and mental state of the defendant, and whether the defendant was provided food, water, bathroom breaks (see People v. Guilford, 21 NY3d 205, 208 [2013]; see People v. Sakadinsky, 239 AD2d 443 [2d Dept, 1997]; see People v Brown, 113 AD3d 785 [2d Dept, 2014]; see People v. Hall, 145 AD3d 915 [2d Dept, 2016]; see People v. Johnson, 139 AD3d 967 [2d Dept, 2016]).
A statement obtained by law enforcement may also be deemed involuntary if obtained by certain improper promises or statements of fact, or in violation of the State or Federal constitution (CPL § 60.45(2)(b)(i) and (ii)). One of those constitutional rights, the privilege against self-incrimination, is protected by the Miranda rule (see People v. Berg, 92 NY2d 701 [1999]). "Because the privilege applies only when an accused is 'compelled' to testify, the safeguards required by Miranda are not triggered unless a suspect is subject to 'custodial interrogation'" (Berg, at 704). "Both the elements of police 'custody' and police 'interrogation' must be present before law enforcement officials constitutionally are obligated to provide the procedural safeguards imposed upon them by Miranda" (People v. Huffman, 41 NY2d 29, 33 [1976]). A suspect is in custody if in that same situation, a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave (see People v. Harris, 48 NY2d 208, 215 [1979]; People v. Yukl, 25 NY2d 585, 589 [1969]). "The term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response" (People v. Ferro, 63 NY2d 316, 322 [1984], quoting Rhode Island v. Innis, 446 US 291, 301 [1980]).
Here, prior to the start of testimony, defense counsel moved to preclude the statements allegedly made by the defendants, arguing that though the People had served statement notice at the Criminal Court arraignment, they had failed to serve statement notice within 15 days of the Supreme Court arraignment on the indictment pursuant to CPL § 710.30, and failed to show good cause for the same (Tr. at 3-5). Defense counsel also argued that the statement notice portion of the Notice and Disclosure Form was not checked off (Tr. at 3-5). In response, the People merely argued that they opposed the application for preclusion, that there was no withdrawal of the statement notice served at the Criminal Court arraignment, and that the failure to mark the notice and disclosure form to indicate that there was a statement they intended to use at trial did not invalidate their initial notice (Tr. at 3-4). Neither party clarified for the record the contents of the original statement notice. Without more, the Court agreed to hold the ruling in abeyance while they attempted to find caselaw on the issue and begin direct examination of the first witness (Tr. at 5-6).
Following the conclusion of the People's direct examination of Officer Orellana, but before any cross examination, the Court granted preclusion, and stated:
Pursuant to Criminal Procedure Law section 710.30, the 15 day time limit applies to an accusatory instrument on which the defendant may be tried. In this case, it would be the indictment. The Criminal Procedure Law practice notes indicate that the 15 day time period for which a felony starts is at the arraignment in the Superior Court and is strictly construed, and counsel should be vigilant in ensuring compliance with the time requirement. So, based on that reading of CPL 710.30, the 15 day deadline has passed and so any statements made by the defendant that were not served at the time of Superior Court information, which Superior Court is Supreme Court here in, Brooklyn, those statements have to be precluded at this time.
(Tr. at 29-30; see People v. Littlejohn, 184 AD2d 790 [2d Dept, 1992]; see People v. Alcindor, 157 Misc 2d 725 [Crim. Ct. Kings Co. 1993]).
Following the conclusion of the hearing, the People reached out to the Court via email with respect to the Huntley portion of the hearing. They attached three cases for the Court's consideration and inquired if the Court wanted to continue the hearing or have the People file a motion to reargue on the issue (Email from Alexis Lightner, Brooklyn District Attorney's Office, to Shirin Zarabi [Mar. 8, 2024, 2:16 PM EST]). The cases provided by the People, seem to support the argument that the failure to serve statement notice after the Supreme Court arraignment does not warrant preclusion because the statement notice served at a Criminal Court arraignment would be sufficient to provide adequate notice to the defense (see People v. Shoukron, 234 AD2d 400 [2d Dept, 1996]; see People v. Fogle, 104 AD3d 873 [2d Dept, 2013]; see People v. Santana, 191 AD2d 174 [1st Dept, 1993]). The Court acknowledges and agrees with the holdings of the cases cited by the People. However, in this case the People failed to provide any facts or arguments (e.g., the substance of the initial notice, whether the statement was inculpatory or exculpatory, whether the statement was contained on body worn camera footage, if the defense had otherwise acknowledged statement notice, etc.) that would allow this Court to determine that the original statement did in fact put the defense on notice (see CPL § 710.30[1][a]; see also People v. Lopez, 84 NY2d 425 [1994]; see also People v. Pallagi, 91 AD3d 1266 [4th Dept, 2012]). Without that information, there was no basis for this Court to determine that the Criminal Court arraignment notice was sufficient and timely.
This Court has since taken it upon itself to access the statement notice that was provided at the Criminal Court arraignment and learned that the statements attributed to Peters were allegedly made to Officer Orellana on the scene, during or immediately subsequent to his apprehension, and that the statements made by Benjamin were made to Lieutenant Maldonado on the scene, during or immediately subsequent to his apprehension. The statements appear to be included on the body worn camera footage the People entered into evidence during the hearing. However, notwithstanding the issue of preclusion, while the statements were not in response to questions and were spontaneously made by the defendants, statements would still be suppressed as fruit of the poisonous tree, as they were a direct consequence of unlawful police conduct, as discussed supra (see Dunaway, supra).The Court sees no basis to reopen the hearing under these circumstances.
This constitutes the Decision and Order of the Court.
Dated: March 27, 2024
Kings County, New York
Hon. Claudia Daniels-DePeyster, A.J.S.C

Footnotes

Footnote 1:Notably, a bag was never recovered (Tr. at 36).

Footnote 2:The BMW was transported back to PSA 2 by Officer Felsberg (Tr. at 20, 42).